**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bradley Barker, | No. CV-18-08136-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Bradley Barker ("Barker") seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("Commissioner"), which denied his application for disability benefits. For the following reasons, the Court finds that the administrative law judge's ("ALJ") decision was based on reversible legal error and remands for further proceedings.

Barker alleges he became disabled in March 2010. (A.R. 39, 179.) In May 2014, Barker filed an application for disability benefits. (A.R. 179-85.) After this claim was denied (A.R. 121-24, 126-27), Barker filed a written request for a hearing. (A.R. 128.) On January 20, 2017, Barker appeared and testified at a video hearing at which an impartial vocational expert also appeared and testified by telephone. (A.R. 33-90.) On June 12, 2017, the ALJ issued a decision that Barker was not disabled within the meaning of the Social Security Act. (A.R. 12-32.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Barker's request for review. (A.R. 1-6.)

**LEGAL STANDARD**

The Court addresses only the issues raised by the claimant in the appeal from the ALJ's decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001), *as amended on reh'g* (Aug. 9, 2001). The Court should uphold the ALJ's decision "unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* Put another way, "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The Court should uphold the ALJ's decision "[w]here evidence is susceptible to more than one rational interpretation," but the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (citations and internal quotation marks omitted).

"[H]armless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." *Id.* (citations and internal quotation marks omitted). The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." *Id.* Importantly, however, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Id.* at 1121.

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, and the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled

and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled.

## BACKGROUND

At step one, the ALJ found Barker met the insured status requirements of the Social Security Act through December 31, 2014 and had not engaged in substantial gainful activity since March 15, 2010, the alleged onset date. (A.R. 17.) At step two, the ALJ found that Barker had the following severe impairments: deep vein thrombosis ("DVT"), migraine headaches, and obesity. (*Id.*) The ALJ also found Barker had the following non-severe impairments: degenerative joint disease, obstructive sleep apnea, pancreatitis, Peterson's internal hernia, status-post laparoscopic reduction and repair status-post gastric bypass, hypertension, eczema, jejunal ulcer, hypercoagulable state on Coumadin, and anemia. (A.R. 18.) At step three, the ALJ determined that Barker did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (A.R. 20.) At step four, the ALJ found that Barker "had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can perform only simple, routine tasks secondary to decreased attention and concentration due to headaches." (A.R. 21.) The ALJ further found that Barker was unable to perform any past relevant work. (A.R. 24.) At step five, the ALJ found that, "considering [Barker's] age, education, work experience, and residual functional capacity,

1 | there were jobs that existed in significant numbers in the national economy that [Barker] could have performed," including document preparer, call-out operator, and escort vehicle driver. (A.R. 24-25.)

Barker argues the ALJ's decision is defective for three reasons: (1) the ALJ erred in rejecting his symptom testimony; (2) the ALJ erred in weighing treating physician Valerie Guernsey's opinions; and (3) the ALJ erred in his step-five determination. (Doc. 13.)

As explained below, the Court agrees that the ALJ erred in rejecting Barker's symptom testimony and weighing Dr. Guernsey's opinions and declines to rule regarding the third alleged error.

I. <u>Whether the ALJ Erred in Rejecting Barker's Symptom Testimony</u>

A. **Legal Standard**

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina*, 674 F.3d at 1112. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (citations and internal quotation marks omitted). The ALJ found that Barker had satisfied this first step. (A.R. 21 ["[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ."].)

If the first step is satisfied, and "there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (citations and internal quotation marks omitted). Such testimony can't be rejected simply because it can't be verified by objective medical evidence. 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Here, the ALJ did not find there was evidence of malingering, so he was required to provide "specific, clear and

convincing reasons" to reject Barker's testimony.

"A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (citation and quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony.").

B. **Barker's Testimony**

Barker testified that his DVT causes pain and exhaustion. (A.R. 53.) He experiences leg pain daily for a few hours at a time, and it can reach up to a seven or eight out of ten on the pain scale. (A.R. 53-54.) He also experiences pain in his hands every few days, which can also reach up to a seven or eight out of ten. (A.R. 55.) With respect to exhaustion, he testified that he has to take frequent breaks and elevate his legs while performing basic tasks. (A.R. 54-55.) He testified that he only walks around for about 45 minutes per day and can only sit without his legs elevated for about 45 minutes per day. (A.R. 57-58.) He claimed he has to elevate his legs for 30 minutes each hour. (A.R. 61.) He also testified that his obesity exacerbates the pain and exhaustion. (A.R. 58-59.)

Barker further testified during the hearing that "since 2010" he gets migraines three to four times a week. (A.R. 56.) These last for a couple hours at a time and usually require him to lie in bed with no light or sound and to use a cold compress on his head or neck. (A.R. 56-57.)

In his pain questionnaire, Barker stated he has "stabbing migraine headaches," "radiating pain in [his] arms," and "shooting pains in his hands [and] feet." (A.R. 255.) He claimed he could stand/walk for 10 to 15 minutes and sit for 20 to 30 minutes before

1  experiencing pain.  (*Id.*)

   C. **Analysis**

The ALJ concluded that Barker's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record in the record for the reasons explained in this decision." (A.R. 21.)

As an initial (and dispositive) matter, the ALJ's assertion that he rejected Barker's symptom testimony "for the reasons explained in this decision" is inaccurate—the ALJ never once in his decision explicitly addressed Barker's symptom testimony. Thus, just as in *Brown-Hunter*, the ALJ erred in "fail[ing] to identify the testimony []he found not credible." 806 F.3d at 494.

The Commissioner disagrees that the ALJ's opinion is devoid of reasoning on this key point, arguing that "[t]he ALJ summarized Barker's allegations" and "discounted" these allegations because they "were inconsistent with objective medical findings." (Doc. 17 at 3-4.) With all due respect to the Commissioner, this is not true. The Court has carefully reviewed the ALJ's decision multiple times and is unable to find any mention of Barker's specific testimony concerning his symptoms. Tellingly, the Commissioner's brief does not cite any part of the ALJ's decision in which the ALJ was supposedly summarizing and discounting Barker's specific allegations. *Burrell v. Colvin*, 775 F.3d at 1138-39 ("The government argues that Claimant's testimony that she has, on average, one or two headaches a week conflicts with the medical record. As an initial matter, the ALJ never connected the medical record to Claimant's testimony about her headaches. Although the ALJ made findings . . . concerning Claimant's treatment for headaches, he never stated that he rested his adverse credibility determination on those findings. For that reason alone, we reject the government's argument that the history of treatment for headaches is a specific, clear, and convincing reason to support the credibility finding."). As noted, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Molina*, 674 F.3d at 1121; *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009)

(noting that court must "review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking"); *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision. Thus, if the Commissioner's contention invites this Court to affirm the denial of benefits on a ground not invoked by the Commissioner in denying the benefits originally, then we must decline.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Moreover, "providing a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing reasons for finding the claimant's symptom testimony not credible." *Brown-Hunter*, 806 F.3d at 494. Here, the ALJ concluded "the medical records overall do not indicate the [DVT] would result in greater exertional restrictions than provided for in the claimant's residual functional capacity" and then cited one medical record from July 17, 2012, indicating "[t]here is good augmentation and compression from the common femoral through popliteal veins bilaterally," "[d]oppler spectral waveform have an unremarkable venous pattern," "[n]ormal study," and "[t]here is no evidence of DVT." (A.R. 21-22.) Yet the ALJ also acknowledged Barker had been hospitalized for his DVT in 2010 and credited a July 31, 2012 record indicating that Barker would require lifelong anticoagulation due to recurring DVT. (A.R. 21.) The ALJ's summary of the medical record regarding the DVT cannot be said to constitute a clear and convincing reason for rejecting Barker's testimony, given that it still remains unclear on what basis the ALJ was rejecting Barker's testimony that his DVT requires him to elevate his legs 30 minutes out of every hour. (A.R. 61)

Accordingly, the ALJ erred by not providing specific, clear, and convincing reasons for rejecting Barker's symptom testimony. That error was not harmless because the vocational expert testified that "[t]here would be no work for [a] person" who had to elevate his legs for 30 minutes out of every hour. (A.R. 83.)

II. <u>Whether the ALJ Erred in Weighing Treating Physician Guernsey's Opinions</u>

   A. **Legal Standard**

Although "[t]he ALJ must consider all medical opinion evidence," *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008), there is a hierarchy among the sources of medical opinions. Those who have treated a claimant are treating physicians, those who examined but did not treat the claimant are examining physicians, and those who neither examined nor treated the claimant are nonexamining physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who did not treat the claimant." *Id.* This is because treating physicians have the advantage of in-person interaction and typically a longer history of treatment than a claimant's other doctors, and their "subjective judgments . . . are important, and properly play a part in their medical evaluations." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). *See also* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").

Given this hierarchy and a treating physician's position at the top if it, an ALJ may reject uncontroverted evidence from that source "only for 'clear and convincing' reasons." *Lester*, 81 F.3d at 830. Also, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the [ALJ] may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id.* (citation omitted). Where "the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating physician may itself be substantial evidence." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An ALJ can satisfy his burden of providing specific and legitimate reasons "by setting out a detailed and thorough summary of the facts and

conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751–55 (9th Cir. 1989); *see also Embrey*, 849 F.2d at 421–22 ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

### B. **Relevant Medical Opinions**

There are two opinions by Dr. Guernsey in the record. The first was completed in December 2015 (A.R. 833-39) and the second was completed in March 2017 (A.R. 1080-86). In both, Dr. Guernsey diagnosed Barker with major depressive disorder, post-traumatic stress disorder, and ADHD. (A.R. 833, 1080.) Both contain the same limitations, including extreme limitations in "maintain[ing] attention for two hour segment," "perform[ing] at a consistent pace without an unreasonable number and length of rest periods" "deal[ing] with normal work stress," "understand[ing] and remember[ing] detailed instructions," and "deal[ing] with stress of semiskilled and skilled work." (A.R. 836-37, 1083-84.) Also, in both, Dr. Guernsey found that Barker's impairments or treatments would cause him to be absent from work more than three times per month (A.R. 835, 1082). In the December 2015 opinion, Dr. Guernsey indicated that Barker's condition had lasted for 12 months, and in response to the question, "[d]oes this assessment cover from 3/15/2010 through the present," Dr. Guernsey stated she "ha[d] only known [Barker] for 4 months but he supplied historical [information]." (A.R. 833, 839.) In the May 2017 opinion, in response to the question whether the assessment covered May 4, 2011 through the present, Dr. Guernsey stated, "[it] is reasonable and likely that the patient suffered from his mental health conditions for many years, likely before the date referenced in records." (A.R. 1086.)

The ALJ stated he was giving Dr. Guernsey's opinions "little weight" because "Dr. Guernsey did not begin treating the claimant until September 2015, well after the claimant's December 31, 2014 date last insured." (A.R. 19.) The ALJ noted that Dr. Guernsey had diagnosed Barker with depression and post-traumatic stress disorder but did not mention any of Dr. Guernsey's other findings. (*Id.*)

The ALJ stated that he afforded "greater weight" to the opinions of the state agency consultants and consultative examiner, but in that section of the decision he only cited the opinion of the consultative examiner, Dr. Daniel M. Chatel, Ph.D. (A.R. 20.) Dr. Chatel examined Barker in September 2014, found that Barker met the "DSM-5 diagnostic criteria for Depression Not Otherwise Specified," but also found that "the severity of [his] mental health symptoms is mild overall and appears to be reasonably well controlled by his antidepressant." (A.R. 584-85.) Dr. Chatel further found that "[t]here is no evidence on examination to support [Barker's] allegation of memory loss," and the "results of the . . . evaluation indicate that [Barker's] mild mental health symptoms alone do not preclude his participation in substantial employment activities." (*Id.*)

C. **Analysis**

Barker argues the ALJ violated *Smith v. Bowen*, 849 F.2d 1222 (9th Cir. 1988), by disregarding Dr. Guernsey's opinions based on the timing of when she examined him (*i.e.,* after the date he was last insured). (Doc. 13 at 11-13.) In *Smith*, the Ninth Circuit held that "reports containing observations made after the period for disability are relevant to assess the claimant's disability" and that such reports "should not be disregarded solely on [the] basis" that they were "rendered retrospectively." 849 F.2d at 1225. *See also Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1228-29 (9th Cir. 2010) ("While the ALJ must consider only impairments (and limitations and restrictions therefrom) that Turner had prior to the [date last insured], evidence post-dating the [date last insured] is probative of Turner's pre-[date last insured] disability."). In response, the Commissioner cites *Macri v. Chater*, 93 F.3d 540 (9th Cir. 1996) (Doc. 17 at 8-10), in which the Ninth Circuit stated that "[t]he opinion of a psychiatrist who examines the claimant after the expiration of his disability insured status . . . is entitled to less weight than the opinion of a psychiatrist who completed a contemporaneous exam." 93 F.3d at 545.

The Court does not view *Smith* and *Macri* as being in conflict with each other. *Smith* holds that an ALJ can't entirely disregard a treating physician's opinions merely because they were rendered retrospectively, while *Macri* holds that a retrospective opinion is

entitled to less weight than a contemporaneous one. These two lines of reasoning are easy to synthesize—although there may be a thumb on the scale in favor of opinions flowing from contemporaneous exams, an ALJ still must carefully consider retrospectively-rendered opinions and can't disregard them based solely on when they were rendered. *Cf. Nerurkar v. Astrue*, 2010 WL 2569157, *5 n.4 (W.D. Wash. 2010), *report and recommendation adopted*, 2010 WL 2569063 (W.D. Wash. 2010) (finding that *Macri* "did not state that the opinion of a psychiatrist who examines the claimant after the expiration of his disability insured status is entitled to no weight at all").

It is unclear whether the ALJ properly applied these principles in Barker's case. On the one hand, the ALJ's use of the phrases "little weight" and "greater weight" suggests he may have been simply giving more weight to Dr. Chatel's opinions due to their contemporaneous nature—an approach that is permitted by *Macri*. On the other hand, the sole reason proffered by the ALJ for discounting Dr. Guernsey's opinions was timing—the ALJ did not, for example, mention any of Dr. Guernsey's specific findings or purport to explain why they were unworthy of credence. (A.R. 19 ["Dr. Guernsey did not begin treating the claimant until September 2015, well after the claimant's December 31, 2014 last date insured. Accordingly, little weight is afforded to the statements as th[ey] post-date the adjudicatory period at issue."].) And under *Smith*, it is impermissible to reject such opinions based solely on timing.

The Commissioner offers other reasons the ALJ *could have* rejected Dr. Guernsey's opinions, asserting that (1) Dr. Guernsey's opinions "did not accurately reflect Barker's condition on or before December 31, 2014" because by September 2015, "Barker had experienced substantial worsening of his mental symptoms" and (2) Dr. Guernsey's "conclusion [that Barker's condition had lasted for 12 months] was not based on any objective criteria, but on Barker's self-reported history of his symptoms, which the ALJ found not credible." (Doc. 17 at 8-10.) This approach is unavailing because, as with the issue discussed above, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Molina*, 674 F.3d at 1121; *Bray*, 554 F.3d at 1225; *Pinto*,

249 F.3d at 847-48.

Accordingly, the ALJ erred by rejecting Dr. Guernsey's opinion without providing specific and legitimate reasons that are supported by substantial evidence. That error was not harmless because Dr. Guernsey found that Barker's impairments or treatments would cause him to be absent from work more than three times per month (A.R. 835, 1082) and the vocational expert testified that "[t]here would be no work for [a] person" who would be absent from work more than three days per month (A.R. 83-84).

III.  Whether the ALJ Erred at Step Five

At step five, the ALJ found that, "considering [Barker's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Barker] could have performed," including document preparer, call-out operator, and escort vehicle driver. (A.R. 24-25.)

Barker argues the ALJ erred at step five for two reasons: (1) the ALJ found he was limited to performing simple, routine tasks, so he was not capable of performing two of the three jobs the ALJ identified (document preparer and call-out operator) because they require Level 3 reasoning; and (2) the remaining job (escort vehicle driver) does not exist in significant enough numbers in the national economy. (Doc. 13 at 5-9.)

The Commissioner responds that (1) "[t]he occupations the ALJ identified at step five are consistent with Barker's cognitive ability" and (2) "even if this Court finds an apparent conflict regarding Barker's residual functional capacity and the two jobs requiring Level 3 Reasoning, substantial evidence still supports the ALJ's step five finding because the ALJ found Barker could work as an escort vehicle driver, which required only Level 2 reasoning," the vocational expert testified that there are approximately 20,300 escort driver positions in the national economy, and "the Commissioner submits 20,300 is a significant number of jobs in the national economy." (Doc. 17 at 10-14.)

At step five, "the Commissioner has the burden to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [his] identified limitations." *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015) (citation and

internal quotation marks omitted). "The ALJ first assesses a claimant's 'residual functional capacity,' defined as the most that a claimant can do despite 'physical and mental limitations' caused by his impairments and related symptoms." *Id.* (quoting 20 C.F.R. § 416.945(a)(1)). "The ALJ then considers potential occupations that the claimant may be able to perform." *Id.* To do so, "the ALJ relies on the DOT, which is the SSA's 'primary source of reliable job information' regarding jobs that exist in the national economy." *Id.* at 845-46 (citations omitted). "The DOT describes the requirements for each listed occupation, including the necessary General Educational Development ('GED') levels; that is, 'aspects of education (formal and informal) . . . required of the worker for satisfactory job performance.'" *Id.* at 846 (quoting DOT, App. C, 1991 WL 688702 (4th ed. 1991)). The GED levels range from Level 1 to Level 6 and include "the reasoning ability required to perform the job." *Id.* The ALJ also "relies on the testimony of vocational experts who testify about specific occupations that a claimant can perform in light of his residual functional capacity" and concludes step five by "determin[ing] whether, given the claimant's [residual functional capacity], age, education, and work experience, he actually can find some work in the national economy." *Id.* (citation and internal quotation marks omitted).

"When there is an apparent conflict between the vocational expert's testimony and the DOT. . . the ALJ is required to reconcile the inconsistency." *Id.* "The ALJ must ask the expert to explain the conflict and then determine whether the vocational expert's explanation for the conflict is reasonable before relying on the expert's testimony to reach a disability determination." *Id.* (citation and internal quotation marks omitted).

In *Zavalin*, the Ninth Circuit "h[e]ld that there is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *Id.* at 847.[1] It further held that "the ALJ erred in failing to reconcile this apparent conflict" by "fail[ing] to recognize an inconsistency" and therefore "not ask[ing]

---

[1] Although the *Zavilin* court used the phrase "simple, repetitive tasks" in its holding, the court elsewhere used the phrases "simple, routine, or repetitive work" and "simple, routine tasks," 778 F.3d at 845-46, suggesting that the holding applies where an ALJ uses any combination of those words in an RFC.

- 13 -

the expert to explain why a person with Zavalin's limitation could nevertheless meet the demands of Level 3 Reasoning." *Id.*

Here, in response to the ALJ's hypothetical involving an individual "limited to the performance of only simple, routine tasks," the vocational expert testified that such an individual could perform the jobs of document preparer (DOT 249.587-018), call-out operator (DOT 237.367-014), and escort vehicle driver (DOT 919.663-022). In his decision, the ALJ then included the limitation of "simple, routine tasks" in Barker's RFC and found Barker could perform the three jobs the vocational expert had identified. (A.R. 21, 25.) Yet, both document preparer and call-out operator require Level 3 reasoning. *Document Preparer*, DOT 249.587-018, *available at* 1991 WL 672349; *Call-Out Operator*, DOT 237.367-014, *available at* 1991 WL 672186. Per *Zavilin*, there is an apparent conflict between Barker's RFC and the reasoning demands of the jobs of document preparer and call-out operator. The ALJ, thus, erred in failing to reconcile this conflict by asking the vocational expert to "explain why a person with [Barker's] limitation could nevertheless meet the demands of Level 3 Reasoning." *Zavilin*, 778 F.3d at 847. And because the ALJ did not recognize the conflict, he did not otherwise resolve it in his decision.

The Court next considers whether the ALJ's error is harmless, given that the ALJ identified a third job Barker does not dispute he is capable of performing—escort vehicle driver—for which 20,300 jobs exist in the national economy. (A.R. 25, 82-83.) Under the Social Security Act:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). "[W]ork which exists in the national economy" is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* The accompanying regulations indicate that

"[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered work which exists in the national economy." 20 C.F.R. § 416.966(b).

On one end of the spectrum, the Ninth Circuit has held that 25,000 jobs in several regions of the economy "presents a close call" but ultimately "represents a significant number of jobs," thus satisfying 42 U.S.C. § 1382c(a)(3)(B). *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014). On the other end, the Ninth Circuit has held that 1,680 jobs in several regions does not satisfy the statute. *Beltran v. Astrue*, 700 F.3d 386, 390-91 (9th Cir. 2012). Given that the Court is remanding for further proceedings, and the RFC may be different after the ALJ appropriately considers all the evidence, the Court will decline to rule at this time whether 20,300 jobs is significant. *Lyons v. Comm'r of Soc. Sec. Admin.*, 2018 WL 3688985, *2 (D. Ariz. 2018) ("[T]he Court concludes that the wiser course of action is to permit the ALJ in the first instance to weigh in on whether 15,789 is a significant number of jobs.").

IV. Scope of Remand

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). This applies particularly "[i]f additional proceedings can remedy defects in the original administrative proceeding." *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (citation omitted). But there is an exception to this rule, known as the "credit-as-true" rule, under which the court may remand with instructions to calculate and award benefits. For this rule to apply, a three-part test must be satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* at 1020. Importantly, however, courts are required "to remand for further proceedings

when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021 (citation omitted).

Here, although Barker requested remand for an award of benefits, he did not address why or how he could satisfy the credit-as-true rule. (Doc. 13 at 18.) The Court declines to remand for an award of benefits because further administrative proceedings would arguably serve a useful purpose and because the record as a whole "creates serious doubt that [Barker] is, in fact disabled." *Garrison*, 759 F.3d at 1021. The ALJ cited various medical records and medical opinions in support of his RFC finding, and upon remand, it may be possible for the ALJ to use this same evidence to properly consider and reject Barker's symptom testimony and Dr. Guernsey's opinions.

Accordingly, **IT IS ORDERED** that the final decision of the Commissioner of Social Security is **vacated**, and this case is **remanded** for further proceedings consistent with this opinion. The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 7th day of August, 2019.

Dominic W. Lanza
United States District Judge